Good morning, Your Honors. Stephen Katz on behalf of the appellants, Williams & Cochrane. Your Honors, I don't want to belabor the briefing, which is extensive, but I would like to propose a thought experiment to the panel that I think crystallizes precisely why they just recorded Ervin Granter's summary judgment. Imagine that instead of reviewing a grant of summary judgment in favor of Mr. Rosette de Novo, you are instead reviewing a jury verdict in favor of Williams & Cochrane for substantial evidence on the same evidentiary record. I would suggest to you that in this counterfactual review, it would be a fairly easy case. There is substantial evidence that would support a jury verdict in favor of Williams & Cochrane on their Lanham Act claim. How is that? I'm curious, because what's your best evidence that Rosette allegedly, the false advertising caused, that's part of Lexmark, caused injury to Williams & Cochrane? The best evidence is expert testimony concerning the way the legal market works in Indian countries. Specifically, Mr. Forman and Mr. Miranda won an Indian law expert of long-standing reputation. The other, a tribal executive, both testifying that statements in Mr. Rosette's promotional materials concerning his participation in the Payuma litigation. One statement on the website? Or are there more? Well, I think this one statement would be sufficient. Counsel, you said statements. Oh, I'm sorry. Well, there are multiple representations in the one statement. That is, there are representations that Mr. Rosette participated in the Payuma litigation, which I think we can all agree on the record is true. But there are statements about his participation had a particular effect in the litigation. He successfully litigated the case. And there is substantial evidence that that representation is false. There is also substantial evidence. Substantial evidence, not conclusive evidence. No, okay, and I just want to be clear on something. I just, I hope I'm not missing something. That's the only statement, correct? That is the primary statement in the record. Well, it is or it is not. Is there, if there are others, could you tell me on the, where in the record are those other statements? No, that is the statement that this case is focused on. Okay, thank you. And that is the statement that would provide substantial evidence for a jury to find in favor of Williams and Cochran. Because the representations concerning the Rosette firm, Mr. Rosette's contribution to that litigation could be credited by the jury as false. And if false raises a presumption of materiality and reliance, which presumption is not, would not mean necessary, because there is substantial evidence in the record that would permit a reasonable juror to believe that those statements would be viewed by tribal officials before retaining a firm, particularly replacing the firm they had already hired, and that they would be material to their decision. But what's your best authority for that? Because you seem to suggest that the false advertising raises a presumption of deception. Is that what you're arguing? Yes. Okay. That would come from the Southland-Sod case. But in that case, involved a false comparative claims. Yes. That's not the case here. So why isn't that case distinguished? I would have to suggest, Your Honor, that is not correct. The following reason. Clearly, this is not the paradigmatic classic comparative advertising case. Buy my widgets. Don't buy her widgets. My widgets are better. That would be the classic comparative. That is not this case, conceitedly. However, we are talking about an acutely specialized legal market. This isn't a fairly routine contract dispute or slip and fall case or anything like that. This is a very specialized market with a very limited number of players who have the expertise within the market. And because of the limited nature of the market, a reasonable juror could view a false claim of credit in a particular piece of litigation as being concerted. Counsel, if we give credit to that argument, I mean, and I'm just sort of thinking of smaller communities where there are attorneys. Let's say that they specialize in criminal law. And let's say that there's only, oh, I don't know, two attorneys that puts in their website, oh, Spanish-speaking attorney, I specialize in criminal law, and I've gotten all of these people off. So under your analysis, then, that somehow would allow others to sue that individual attorney for taking their clients. If those statements were false. That's a big difference. If those statements were false. Competition among lawyers without false statements, legitimate competition, of course is not actionable. In the trivial sense, anyone could sue, because as we all know, anyone can file a lawsuit and that's what litigation is about. It could be weeded out. But it wouldn't be a legitimate claim without falsity. And here there is substantial evidence of falsity. Not evidence that would conclude some, that requires summary judgment in favor of Williams and Cochran. I'm not claiming that. But there's enough for a reasonable jury to say that was false. But even without the presumption, there's still substantial evidence. But even if this presumption of deception applies like you're arguing, that only gives rise to a rebuttable presumption, correct? Of course. All right. So hasn't Rosette overcome that presumption? No. Why not? Not in this context. That is exactly why I proposed the thought experiment. Let's play this out. The juror says, yes, tribal executives testified. They never saw the statement. Mr. Rosette is here and testified. I never told anyone. We don't find that testimony credible. We have testimony in front of us from experts in the area who say a tribe would necessarily look for that information. Someone would look at the website. The district court heard that, that evidence, correct? The court did. And we know it was not the case. But this is a summary judgment appeal, Your Honor, not my counterfactual. This is not a jury verdict being reviewed for substantial evidence. See, this is my point. If there's enough evidence on this record that you would sustain the jury verdict for substantial evidence because the juror said, I don't credit that testimony, I credit this testimony more. If that's enough on this record, then how can summary judgment be granted in the other direction? You can't hold the two thoughts in your mind at the same time, which is why I proposed the counterfactual. That's the problem here. Counsel? Yes, this evidence was in front of the trial court, but it was hearing a – I'm sorry, Your Honor. Thank you. It's my understanding, then, that you're telling me it's not just about how the individual tribe that fired your client was deceived or not deceived, but also kind of the marketplace. Yes. Define the market for me. I don't think that was defined in the papers. Okay. And I don't think I can define a market for you with the kind of precision you would expect in an antitrust case, but we're not in an antitrust case. But the market here would be Indian tribes, Indian – probably Indian tribes within California, Indian tribes who had gaming compacts with the State. And they would be looking at a very small, acutely specialized community of lawyers who not only – Was this evidence – I'm sorry. Was this evidence presented? You're telling me that it exists. I'm asking whether or not when you were opposing summary judgment, this evidence was presented. Well, Your Honor, evidence in the sense that here's how the market is defined. An expert says this is the market. I don't think you're going to find evidence phrased in that way, but I think it is clear, clearly implicit, very much on the face of Mr. Foreman's testimony, Mr. Miranda's testimony, that this is a specialized market. Tribes are looking for attorneys well-versed in Indian affairs and specifically well-versed in the ins and outs of the Indian Gaming Regulatory Act and the negotiation of compacts. Highly – and in fact, there is some evidence in the record – I can't give you a citation. I'd be glad to provide a letter briefly. But there's some evidence in the record from which a jury could infer that there's a very tiny handful of players, maybe even as few as two or three, in that very, very acutely defined case. If Ketchewan had not fired Williams and Cochran, would you be here today? Is there a case, a Lanham Act case, even though that sentence exists? I don't know. I don't know because I don't know what Williams and Cochran would have been inclined to do about those representations, which are still out there and which are still false, irregardless of the firing. What do we do with the statements that the client here thought it was just too Well, those statements are in the record. What you do with them is ask whether a reasonable juror would be compelled to conclude nothing but that those were the only reasons for the fire. And I don't think you can. And the fact in the record that allows a reasonable juror to discredit those to some degree, assuming they believe the representations at all – I'll leave that credibility and determination aside – but just the amount of time. The record shows that these concerns existed for a fairly lengthy time. What was, if you will, the straw that broke the camel's back that caused Williams and Cochran to be fired exactly when they were fired, immediately following meetings with this Rosette? And what transpired in those meetings? A reasonable juror could conclude that we simply do not believe fully the evidence presented by the tribe. We think it makes more common sense the tribe looked at Mr. Rosette's website, saw his materials, that he talked about his experience with this kind of issue, and that that motivated them to make the change. Wasn't there – and correct me if I'm wrong, counsel – I believe there was deposition testimony that they did not see the sentence and nobody had looked it up – Keshwan, anyway – had not looked it up before firing Williams and Cochran. That is correct. So how would a reasonable juror come to the conclusion that you say when their evidence is that no one ever saw the advertising? Because, Your Honor, I think the record is not that no one ever saw the advertising. The record is that particular individuals testified, I didn't see the advertising. And I never learned about that. But first of all, a reasonable juror could say, I simply don't find that credible in light of the nature of the market, the importance of this litigation. The record shows that the tribe got to Williams and Cochran through publicity about the Paiuma case. I mean, the publicity was more direct. Those statements, though, came out during deposition, correct? I'm sorry? The statements that, you know, I never saw the sentence, those came out during a deposition, correct? I believe that's correct, Your Honor. So there was no back and forth there where it's like, well, you know, I just – I can't believe that if I'm taking someone's deposition and they are saying something that is completely opposite of what my client needs or whatnot, that I wouldn't, you know, flesh that out. Unfortunately, Your Honor, I'm not trying to be obstructionist. I can't address that because I didn't participate in the litigation below. I guess my point, though, is as a juror, I could believe that. I could say, well, maybe it is credible because if he was in a deposition, they certainly would have asked him that. You certainly could – you certainly could conclude that as a juror. That would be reasonable. But you could also reasonably conclude, I don't believe it. There was too much at stake for this tribe to simply switch lawyers at this point in the proceedings without having done their due diligence, without believing that the new lawyer had something to offer us in terms of the outcome of the litigation, not just that they were cheaper in the short term. But, counsel, what you're arguing is that the absence of evidence suggests that, oh, yeah, a reasonable person would find that the other way. No, Your Honor. It's not the absence of evidence because the foundation for it is the testimony of Mr. Miranda and Mr. Foreman about the way these things are handled by Indian tribes, about the way Indian tribes go about handling their business interests, particularly gaming business interests. That's the testimony that a reasonable juror could say, that makes more sense to me than the claims that these tribal leaders said, well, it was too expensive and we like Mr. Rosette and he bought us a great breakfast, so we're going to switch lawyers. Did you want to make a comment about the attorney-client privilege ruling? Well, very briefly, the privilege issue. Your Honor, I think the clearest indication that Judge Curiel's ruling evidentiary ruling is incorrect is Judge Curiel's own jurisprudence because very recently, near the end of last year, in a case that I think has no principal distinction, he ruled that federal common law privilege would apply. That case, the Infantides case, I'm not pronouncing it correctly, I'm sure, but it's cited in your papers. In that case, he followed the contrary rule, the rule that we're advocating. That was an employment discrimination case with 11 causes of action, eight under the California Government Code, three under federal employment laws, and there he had no problem applying federal privilege law. His characterization in this case that somehow the center of gravity of the case was in state rather than federal law is belied by that very decision. I don't understand why it was error in applying the California law instead of the federal law. Why isn't that harmless? Because it's well-established and it was addressed in the papers. State law privilege law is more expansive than federal. Well, then looking at the privilege law, what kind of document do you think that Rosette withheld that could create a genuine issue of practice as opposed to the proximate cause here? Because that's what we're looking at. I don't know, Your Honor. That is the very point. Thank you. Thank you, Your Honor. Sorry, a little slow. Thank you for holding me. It's all right. No problem. Take your time. Good morning, Your Honors. Brittany Rogers. May it please the Court. I'd like to take Mr. Katz's thought experiment a little further here. Can you pull the microphones up? I'm having trouble. Yes, of course. Is that any better? Yes. I will project. If this case had gone to trial and Williams and Cochran's claim remained the same as it was as the Court decided at summary judgment, the claim is a single sentence in Mr. Rosette's attorney biography that he deceived the Quetzon tribe into firing Williams and Cochran and hiring Rosette. And you have the president, the then president of the tribe, testifying unequivocally that he never saw, considered, or thought about the sentence. You have a council member of the tribe, the only other person present at the initial meeting, saying, we didn't discuss the sentence. I didn't review marketing materials. It wasn't even our priority at the time to file litigation at the state. All we wanted was to negotiate a final compact by the end of the legislative session, which is what their declarations say. And Mr. Rosette was at breakfast telling me he could handle that negotiation and another state negotiation for one-fifth of what Williams and Cochran was charging. To be clear, they were charging the Quetzon tribe, a rural tribe whose traditional lands are along the lower Colorado River just north of the Mexican border, $50,000 a month flat fee to negotiate a gaining compact. This is not an extraordinarily complex litigation, and the work that they did during that time period was minimal from the records that were produced in Discovery. The tribe was already dissatisfied with their work, and they met with Mr. Rosette. They asked about his California experience, and he told them his experience was extensive. Williams and Cochran was also insisting that the tribe would need to pay them a $6 million contingency fee when the compact was complete. Whether or not any litigation was filed, this is just a gaining compact with one state. It defies logic that anyone would have any other conclusion than the tribe wanted to switch attorneys because it was dissatisfied. And as to the two experts that Mr. Katz pointed to, Mr. Miranda and Mr. Forman, these are individuals within the Indian community, neither of whom was particularly fond of Mr. Rosette. Mr. Forman is a tribal law attorney. Mr. Miranda is a gaming executive. Neither of them has ever been in a position to hire a tribe to negotiate a gaining compact, to oversee litigation concerning a gaining compact, or anything of that nature. As Mr. Katz acknowledged, this is not your traditional Lanham Act case. But if it were, let's think about we're two car dealerships, not two law firms. These experts would be the equivalent of bringing in another car dealer and someone who drives a car but never bought a car to say what is important to people in buying cars. Williams and Cochran had no evidence of how the actual market would react. They did no surveys, no studies. There is no evidence in the record. These are two individuals saying, yeah, I think that sentence in his biography, nested in a 17-page brochure about the firm, really would have been important to a tribe. Counsel, I apologize for interrupting, but I have a question. We all know the statement that is at issue here. Is it false? Your Honor, we would contend that it is not false. And I'm happy to explain it. Please. So it is uncontested that the statement was written and published in 2011. Mr. Rosette had planned this litigation, laid out the strategy, supervised the litigation. He had two associates, Ms. Williams and Mr. Cochran, neither of whom had ever represented a tribe in any capacity as a working attorney. And he filed a very important complaint that resulted in a very important preliminary injunction for Palma. That preliminary injunction allowed Palma to stop paying under its amended compact or its compact and start paying under its 1999 compact. That ruling saved the tribe $100 million on a go-forward basis. That is just true. It is, in fact, how Williams and Cochran advertised it as well. Palma eventually replaced Rosette with Williams and Cochran when they left the Rosette firm. They took over the litigation. They litigated for a long time, and they secured a $36 million monetary judgment. This statement doesn't refer to that judgment. It couldn't have. It was published two years before the judgment was entered. And Mr. Rosette was proud of what he did there. By saying he successfully litigated case, he's not saying no one else was involved. He's not saying Mr. Cochran and Ms. Williams didn't contribute along the way as associates he was supervising. But that was his work, and he stood by it. Go ahead. One of the issues that Williams and Cochran has brought before this court is that the district court basically got it wrong for not making a determination as to false city. Instead, the district court said, hey, we didn't find causation here, so we don't need to go to false city. What's your position on that? Your Honor, it goes back to the fact that this is not a standard Lanham Act case. In a standard Lanham Act case, you're thinking about two competing businesses with competing products. In that world, where it can be difficult for one competitor to prove this ad actually diverted businesses or sales, there are various presumptions in the case law that can be debated that those businesses can rely on in pleading and proving injury and causation. Our case is very different because Williams and Cochran is not saying broadly the market had this reaction. They're saying specifically, Quitson fired us because of this sentence. And, Your Honor, need look no further than the operative complaint, which is in the supplemental record at 758, paragraph 221. It specifically says they allege this sentence deceived Quitson's president and, quote, unquote, putative council member William White into firing Williams and Cochran. That's the only alleged injury that they suffered. They didn't do discovery on anything else. They didn't submit expert testimony on anything else. None of their experts conducted any surveys or any analyses of how tribes view marketing. They could have potentially gone that way, and they didn't. And just to correct something that Mr. Katz mentioned earlier, this sentence was taken down from Mr. Rosette's biography after the court denied our motion to dismiss, and Mr. Rosette sadly predeceased the summary judgment order in this case, and so his biography is not relevant to their business going forward. Can I ask you about the application of the California law to the discovery dispute? I think you argue that that application was not clearly erroneous or contrary to law. Do we review that decision for clear error? The answer, Your Honor, is we believe so. The standard of review was not recited in Williams and Cochran's opening brief, but our position is it doesn't actually matter whether the court looks at it de novo or for clear error. The magistrate judge was faced with two competing discovery disputes that he heard at the same time. Williams and Cochran was challenging both Rosette's privilege log and Quisson's privilege log. Rosette's privilege log obviously claimed privilege over communications with its client that satisfied the attorney-client privilege, and the court had to decide at the same time over both privilege logs, which law would apply. Our position that, in fact, the reply brief does not dispute is that the result would not have been different under federal law. But you do – do you acknowledge now that federal law would and should apply? I understand your argument that we review it de novo is harmless, but do you – I guess, can you identify any examples where a federal court has applied straight privilege law to a claim arising under federal law? So the parties briefed it under federal law. The magistrate judge raised the issue sua sponte, and Williams and Cochran took the position on the record that federal law should apply. The challenge, I believe, is that most of the documents and all of the discovery related to Williams and Cochran's claims against the tribe. Those tribes, those claims, all arose from state law. And, in fact, their argument, their bleed argument, was that the tribe waived its privilege by asserting state-based counterclaims and state affirmative defenses. When you look at the actual privilege log, the first document that Rosette withheld in time related to the Quetzon relationship is dated after the initial meeting. The first internal document is June 19th, which is three days after Mr. Rosette was introduced to the tribe. And the first communication with the tribe that was withheld is dated June 22nd. There is no way that any of those communications would have any bearing on Williams and Cochran's Lanham Act claim. They related to Williams and Cochran's claims against the tribe, related to breach of contract, breach of fiduciary duty, the litany of other claims that were litigated in this case that involved the tribe, all of which arose under state law. So, Your Honor, we think that the record is clear here. We have the tribal president saying we never considered this. We have the tribal council, the member of the tribal council, saying we didn't consider this. We were not interested in litigating against the state. And one of the points that I'd like to address from the briefing, and I know my time is running down, is this argument that we are somehow hiding behind the privilege and blocking discovery into this conversation, these early communications, which is objectively and verifiably false. Because of the dates of the documents we withheld, we didn't withhold documents leading up to this meeting or involving this meeting. And Williams and Cochran, actually, Your Honor, elected not to depose anyone in the case. They didn't depose Mr. Rosette and say what did you say, what did you give them, what did you do. They didn't depose President Escalante and say, you know, tell us about your decision making. They didn't depose Council Member William White. They didn't depose any other tribal council member to verify, corroborate, undermine that testimony. So to the extent that Williams and Cochran's argument now is there is not enough in the record for us to disprove the showing that Rosette made, that's a decision they made. That's a tactical decision they made. And there is nothing respectfully in the privilege log that would have changed that. And if Your Honors have no further questions, I would be happy to submit. Thank you very much. Mr. Katz, you ran out of time, but I'll give you two minutes. Okay, well then I'll make it two very quick points and then submit unless Your Honors have questions for me, in which case, of course, I'm at your disposal. Taking the last point first, the notion that depositions could have been taken, people could have been questioned, you could have followed up on their answers and tried to impeach them. As we all know from our litigation experience, it's almost entirely a fool's errand until you have the underlying documents and you have material to impeach. Otherwise, you are, unless you have an unbelievably poorly prepared witness, you're at the mercy of what the story of the witness is prepared to tell you. Documents first, and appellants were thwarted at that initial stage to get the underlying documents to see which direction they should go in order to elicit. In order to impeach and elicit the testimony. The other point very quickly, and this goes to Judge Mendoza's question about the statement. The statement, the one sentence is what's critical here, but we can't literally take it as that sentence starting with this word and ending with that word. So if somebody says, I didn't see that statement right there, they haven't seen that representation. Because that statement could be paraphrased. Mr. Rozette could say, the Payuma litigation, that was really me. I was the one who won that. Those associates were just doing my bidding. That, in effect, is the same representation, and arguably under this record, misrepresentation that the statement, quote, unquote, is. And it's important in focusing on the statement to not be mesmerized by those exact words inside of quotation marks, but the ideas that are conveyed in that statement. And with that, I'm prepared to submit. Thank you very much, Mr. Katz and Ms. Rogers. I appreciate your oral argument presentations here today. The case of Williams and Cochran v. Sharon Rozette and the Ketchikan Tribe of the Payuma Indian Reservation is now submitted. That is the last case on our docket for today, so we are adjourned. Thank you. All rise. This court for this session stands adjourned.
judges: MURGUIA, MENDOZA, ALBA